DA 22-0389

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 151

KELLY DEAN WORTHAN,

Petitioner and Appellant,

v.

STATE OF MONTANA,

Respondent and Appellee.

APPEAL FROM:     District Court of the Twenty-First Judicial District,
                 In and For the County of Ravalli, Cause No. DV 20-133
                 Honorable Jennifer B. Lint, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Caitlin Carpenter, Montana Innocence Project, Missoula, Montana

        Sarah Lockwood, Tipp, Coburn & Associates, P.C., Missoula, Montana

        For Appellee:

        Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
        Attorney General, Helena, Montana

        William Fulbright, Ravalli County Attorney, Hamilton, Montana

                                        Submitted on Briefs:  June 14, 2023

                                        Decided:  August 8, 2023

Filed:

_____
              Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Kelly Dean Wortham (Worthan) appeals the denial of his second postconviction relief (PCR) petition relating to his convictions for two counts of sexual intercourse without consent, § 45-5-502, MCA; two counts of incest, § 45-5-507, MCA; and one count of tampering with a witness, § 45-7-206, MCA. We conclude Worthan's second petition is time barred and must fail.

¶2     We affirm and restate the dispositive issue on appeal as whether Worthan's petition is time barred.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Worthan was charged in 2004 by amended information with two counts of sexual intercourse without consent and two counts of incest. The victims were his daughters, nine-year-old O.W. and eight-year-old K.W., and the offenses were committed between November 1, 2002, and April 28, 2003.[1] Worthan was also charged with tampering with witnesses, specifically O.W.

¶4     A jury convicted Worthan of all counts. The District Court sentenced Worthan to 130 years in prison with 60 years suspended. Worthan's convictions were affirmed on appeal. *State v. Worthan*, 2006 MT 147, 332 Mont. 401, 138 P.3d 805. Worthan filed his first PCR petition in 2007 asserting a claim of ineffective assistance of counsel (IAC). Following an evidentiary hearing, the court denied Worthan's petition. In 2010, this Court

---

[1] O.W. and K.W. were adopted after Worthan's trial. As a result, their legal initials are now O.B. and K.B. Nonetheless, we will refer to them as O.W. and K.W. to conform with the appellate briefing.

affirmed. *Worthan v. State*, 2010 MT 98, 356 Mont. 206, 232 P.3d 380. Worthan also filed IAC claims in federal court, which were all denied. *See Worthan v. Law*, CV 11-48-M-DWM (D. Mont. July 27, 2011); *affirmed by Worthan v. AG of Mont.*, 514 Fed. Appx. 671 (9th Cir. 2013); *cert denied by Worthan v. Frink*, 571 U.S. 894, 134 S. Ct. 224 (2013). Worthan also requested the appointment of counsel, which was denied by the district court and affirmed by this Court. *State v. Worthan*, No. DA 16-0457, 2017 MT 74N, 2017 Mont. LEXIS 132. Lastly, in 2015 and 2018, Worthan's suspended portion of his sentence was twice revoked for contacting the victims.

¶5     In April 2020, Worthan filed the instant PCR petition, his second, and moved for a new trial in the original proceeding and requested discovery. Worthan asserts a *Brady* violation, contending that the State withheld information and records of a different proceeding which should have been disclosed to Worthan. The District Court denied Worthan's petition and all outstanding motions without ordering the State to respond.

¶6     Some discussion of the underlying facts is necessary. Worthan and his wife, Melissa, had three children together: a daughter, O.W.; a daughter, K.W.; and a son, W.W. In April 2003, O.W. went to see her friend, C.S., for a sleepover at C.S.'s house. At the sleepover, O.W. told C.S., "my dad does bad things to me." C.S. told her mother, Tammy, which prompted Tammy to ask O.W. what Worthan had done to her and when it had happened. O.W. explained it was when she was alone with Worthan and while her mother would go to the store. O.W. elaborated that Worthan would make her "lick his private place." Tammy reported the abuse to the school counselor. O.W. also disclosed the abuse to her teacher.

¶7 On April 25, 2003, Shelly Verwolf (Verwolf), Child Protection Supervisor with Child and Family Services (CFS), began an investigation into O.W.'s disclosures. O.W. was interviewed and disclosed that Worthan would put his "private" in her "private" and in her mouth. O.W. explained she was not supposed to talk about the incidents of sexual abuse because Worthan warned her he would go to jail if anyone found out. O.W. also expressed concern about her sister, K.W., because O.W. had seen Worthan take K.W. into his bedroom and lock the bedroom door. Verwolf contacted law enforcement based on the information O.W. provided. Verwolf was already aware of a report from March 2003 that Worthan was involved in "a separate or unrelated matter of sexual abuse."[2]

¶8 On April 28, 2003, Verwolf placed an emergency protective hold on O.W. and K.W. and transported them to the police station for a law enforcement interview. During the interview, O.W. gave disclosures consistent with her prior disclosures, explaining to Verwolf and Police Chief Lewis Barnett, that her father put his private spot in her mouth and private spot inside her private spot. Verwolf inquired whether anything came out of Worthan's private spot, and O.W. shared it was "white stuff, like slime." O.W. elaborated Worthan made her touch his private spot with her hand. K.W. denied sexual abuse during the interview.

¶9 Worthan went to the police station when he learned his children were there. Chief Barnett interviewed Worthan upon his arrival. Worthan admitted speaking to O.W.

---

[2] At Worthan's sentencing, his nieces came forward alleging he had sexually abused them as children. When one of the nieces discovered Worthan had young daughters, she was so concerned that she reported Worthan's past abuse to the hotline at the Department of Public Health and Human Services (DPHHS) in March 2003.

immediately before his interview and mentioned his prior statement to O.W. about him going to jail if O.W. did not recant her statements to Chief Barnett. Worthan denied all allegations.

¶10 Chief Barnett also interviewed Melissa. Verwolf had left the room to attend to the Worthan children where she observed Worthan escorting W.W. out of another room. Verwolf told Worthan he could not take the children. Verwolf observed O.W. curled up in a ball, crying. Verwolf asked O.W. why she was upset. O.W. explained her mother was mad at her for disclosing, and her father told her to tell the authorities what she said was not true. O.W. eventually referenced this incident in therapy and told her clinical therapist, Dr. Debra Ruggiero, that her mother told her that she should have just lied and said it did not happen and that if she got adopted, her mother would not love O.W. anymore.[3] DPHHS removed all three children from Melissa and Worthan's care the same day.

¶11 Beginning April 28, 2003, O.W. and K.W. lived with Mya Fadely (Mya) and Kevin Fadely (Kevin) in foster care for 14 months. Shortly after the placement, O.W.'s foster brother Brandon Fadely (Fadely) began sexually abusing O.W. An investigation into Fadely's abuse began in 2011, when Fadely's adoptive sister disclosed he was also sexually abusing her. The State removed O.W. and K.W. from the Fadely foster home. However, the State returned the Worthan children to the Fadely foster home when their new placement required respite care. When O.W. returned, Fadely continued to sexually assault

---

[3] Due to this exchange, Melissa became subject to a no contact order concerning her daughters. The court ruled that Melissa would be "excluded from any contact with either [O.W.] or [K.W.] during all phases of the trial at which they attend court."

O.W. In 2014, O.W. disclosed Fadely's abuse at a forensic interview. Fadely subsequently pled guilty to sexual intercourse without consent of O.W. from April 2003 to September 2011.

¶12 In August 2003, Dr. Ruggiero was retained to conduct separate weekly therapy sessions with O.W. and K.W. K.W. eventually disclosed Worthan's abuse to Dr. Ruggiero despite not initially disclosing to the police, Verwolf, or the forensic interviewer. Dr. Ruggiero testified she was not surprised that K.W. made a delayed disclosure because K.W. "hadn't had permission all along, to tell." K.W. explained that the sexual abuse committed by Worthan would "tend to be one day [O.W.] and then another [K.W.], kind of taking turns." K.W. said she would dread going home from school because she wondered if it was "going to be a day when it was going to happen" to her.

¶13 Worthan's trial began on June 14, 2004. O.W. and K.W. recalled the instances of sexual abuse committed by Worthan occurring in his bedroom in their Stevensville apartment. The girls ably described the layout of the apartment along with Worthan's bedroom, the bed, and closet. They described in detail to the jury the many instances of Worthan's sexual abuse. The State presented law enforcement and expert witnesses and O.W. and K.W. gave corroborating and consistent accounts of Worthan's abuse.

¶14 The jury found Worthan guilty of two counts of sexual intercourse without consent, § 45-5-502, MCA; two counts of incest, § 45-5-507, MCA; and one count of tampering with a witness, § 45-7-206, MCA. The court imposed sentence and ordered Worthan to have no contact for the duration of his sentence with O.W. and K.W., "by any means." Worthan and Melissa's parental rights were terminated in a separate proceeding.

6

¶15 On June 22, 2004, O.W. and K.W. were removed from the Fadely foster home and went to their new foster placement in Hamilton. J.B., the girls' new foster mother and her husband, adopted O.W. and K.W. While the girls were living with J.B., Melissa went to Hamilton "on numerous occasions" and would show up at J.B.'s house. As a result, J.B. and her husband moved the girls to Missouri in 2008 to give them a "fresh start." Melissa nonetheless continued to contact the girls and send gifts to Missouri.

¶16 In June 2013, Worthan called O.W. and K.W. from prison while they were in North Carolina celebrating a family member's birthday. Worthan's mother-in-law, Pam Cassady (Cassady), answered the call. Worthan asked to speak to K.W., and Cassady gave K.W. the phone. While speaking with K.W., Worthan repeatedly asked K.W. how she felt about him and continued to try to influence K.W. to recant her trial testimony. J.B. said the girls believed the trip was a "ruse" so Worthan could speak with them. O.W. and K.W. were distraught upon arriving home to Missouri. K.W. remained upset about the call for months.

¶17 In November 2014, O.W. testified at Fadely's sentencing hearing.[4] At the sentencing hearing, O.W. explained she was placed at the Fadely foster home because CFS took her "away from a bad situation" occurring at her other home where she was being sexually abused. O.W. testified Fadely, when he was 12 years old, abused her "every night" after "a couple weeks" of living there. O.W. explained she would be sleeping in a shared bedroom with her foster sisters on the top bunkbed when Fadely would come up onto her

---

[4] Melissa continued to pursue O.W. For instance, Melissa met O.W. at the airport when O.W. arrived for Fadely's sentencing. The prosecutor said O.W. was "upset" while in Melissa's presence.

bunk, place his hand over her mouth, undress her pants halfway, and put his penis into her vagina.

¶18    In 2015, Worthan's first revocation occurred based on his phone call to K.W. in 2013. At the revocation hearing, State Investigator Hulme reported that J.B. relayed O.W. had recently moved back to Montana and started living with Melissa and that Melissa had begun "trying to convince [O.W.] that [her and K.W.] were brainwashed and that nothing had happened." O.W. testified she reconnected with Melissa when she turned 17 years old and recently moved back to Montana to live with Melissa "on and off." Worthan also testified at his revocation hearing, suggesting the court amend his conditions to have "unlimited" contact with K.W. and O.W. The court found Worthan violated his no-contact condition by directly calling K.W. and by writing to his daughters. The court revoked Worthan's sentence and reimposed the no contact condition.

¶19    On June 21, 2015, four days after Worthan's first revocation judgment, he began contacting O.W. through prison phone calls. This continued through 2016. Worthan also called O.W.'s fiancé, Batson, forty times—with O.W. on speakerphone for twenty of those calls. Worthan urged Batson to convince O.W. to send him an affidavit saying, "she knows I didn't hurt her or whatever." Worthan also called his former cellmate, Ron Nelson (Nelson), six times to arrange for Nelson to instigate contact with O.W. Worthan called Nelson seven more times to follow-up whether Nelson had established contact with O.W. Worthan urged Nelson to arrange O.W.'s contact with the Montana Innocence Project, praised Nelson for his efforts in contacting O.W., and advised Nelson to "make it all about her."

¶20 On June 6, 2016, Worthan filed a pro se motion for appointment of "private counsel" and a supporting brief in District Court. Worthan alleged O.W. had recanted and referenced the Fadely case and corresponding documents. Worthan asserted newly discovered evidence:

> Specifically, this "recantation" made by the victim in this case on numerous occasions. The victim (witness) stated that the crime did not occur by the defendant. In fact, the victim was being sexually abused before and during Defendant's trial by Brandon Thomas Fadely who is currently serving time in Shelby, MT, for sexually abusing the victim in Defendant's case.

The District Court denied the motion for appointment of counsel. We affirmed on appeal. *State v. Worthan*, No. DA 16-0457, 2017 MT 74N, 2017 Mont. LEXIS 132.

¶21 In January 2018 and in preparation for Worthan's second revocation, State Investigator Jesse Jessop (Jessop) contacted O.W. regarding the 2015-2016 phone contact from Worthan. Jessop testified that O.W. "unequivocally wanted no contact with Kelly Worthan" and declined to testify at the second revocation, wanting "nothing further to do with" him. Jessop reported O.W. "was being manipulated by Kelly and Melissa Worthan, and their circle of friends, and that the counselor with whom Melissa Worthan had set [O.W.] up to 'investigate false memories' was a hoax. [O.W.] adamantly re-affirmed her actual memories of Defendant sexually abusing her during her childhood." O.W. also explained to Jessop she had received unwanted gifts from Worthan—sent through Cassady—including artwork with O.W.'s daughter's name on it, even though O.W. never shared her daughter's name with Worthan. O.W. discarded the artwork but gave Jessop photos of the artwork.

9

¶22 At Worthan's second revocation hearing, the District Court revoked his sentence—based on the multiple phone calls directed at O.W.—and imposed a 130-year sentence with no time suspended. The court imposed a no contact condition.

¶23 In November 2019, Worthan applied to the Montana Innocence Project, which agreed to represent him. The same year, O.W. submitted an affidavit claiming her memory of the Fadely abuse was "much clearer" in her mind and she was "unsure" whether Worthan sexually abused her.

¶24 On April 7, 2020, Worthan filed a second, successive petition for PCR, while simultaneously filing a Motion for New Trial and requests for discovery. Based on O.W.'s affidavit, Worthan claimed he had "newly discovered evidence" that the State had coached O.W. and conspired to cover up the Fadely abuse to implicate Worthan instead. Worthan alleged that the State "knew O.W. was being raped by [Fadely] in the foster home," pointing to an alleged "breakdown in the placement" with the Fadely foster family. Worthan also claimed the State's purported concealment of the Fadely abuse constituted a *Brady* violation. Invoking § 46-21-102(2), MCA, Worthan claimed he did not commit the crimes "for which he was convicted." The District Court dismissed his claims in 2022 without ordering the State to respond. The District Court subsequently denied Worthan's Motion for a New Trial in the criminal docket after the State filed a response and submitted witness affidavits. Worthan appeals.

**STANDARD OF REVIEW**

¶25 This Court reviews a district court's denial of a PCR petition to determine whether the court's findings of fact are clearly erroneous and whether its conclusions of law are

10

correct. *Garding v. State*, 2020 MT 163, ¶ 12, 400 Mont. 296, 466 P.3d 501. Discretionary rulings in PCR proceedings, including rulings related to whether to hold an evidentiary hearing, are reviewed for abuse of discretion. *Wilkes v. State*, 2015 MT 243, ¶ 9, 380 Mont. 388, 355 P.3d 755 (internal citations omitted).

## DISCUSSION

¶26 The State argues Worthan's second PCR petition is time barred since Worthan did not raise his newly discovered evidence claim within one year after he proffered the bases of his claims in 2016 but did not file his petition until 2020. In turn, Worthan argues all new evidence in his second post-conviction petition was timely because he had "an intangible suspicion" that O.W. would recant without any "potential concrete knowledge" of evidence of her recantation.

¶27 Newly discovered evidence is reviewable only if filed within one year after the evidence was discovered or reasonably should have been discovered. *State v. Root*, 2003 MT 28, ¶ 18, 314 Mont. 186, 64 P.3d 1035 (citing § 46-21-102(2), MCA). Section 46-21-102(2), MCA, provides:

> A claim that alleges the existence of newly discovered evidence that, if proved and viewed in light of the evidence as a whole would establish that the petitioner did not engage in the criminal conduct for which the petitioner is convicted, may be raised in a petition filed within 1 year of the date on which the conviction becomes final or the date on which the petitioner discovers, or reasonably should have discovered, the existence of the evidence, whichever is later.

Subsection 2 provides a narrow exception to the requirement that a PCR petition be filed within one year of the conviction becoming final. The triggering point for the one-year

11

period to commence running is when the "petitioner discovers, or reasonably should have discovered" the existence of the new evidence.

¶28 Here, Worthan claims the newly discovered evidence is O.W.'s affidavit and the Fadely prosecution. However, Worthan's own admissions and efforts to secure O.W.'s recantation establishes that, as early as 2016 when he filed a pro se motion for appointment of counsel and supporting brief, he personally represented to the court that the victim offered a recantation and he also referenced the Fadely case. More particularly, on June 6, 2016, Worthan asserted a claim of newly discovered evidence and the need for court appointed counsel when he filed a pleading indicating:

> Specifically, this "recantation" made by the victim in this case on numerous occasions. The victim (witness) state that the crime did not occur by the defendant. In fact, the victim was being sexually abused before and during Defendant's trial by Brandon Thomas Fadely who is currently serving time in Shelby, MT, for sexually abusing the victim in Defendant's case.

¶29 Thus, to accept Worthan's argument that he did not know of the "recantation" until 2020 when O.W.'s affidavit was filed and that he did not know of the Fadely prosecution in 2016 would render meaningless the statutory language of § 46-21-102(2), MCA, requiring that the petition be filed within one year from when the petitioner discovered or reasonably should have discovered the existence of evidence. Through Worthan's own words and representations to the court, he knew of the "recantation" and Fadely conviction in 2016 yet waited until 2020 to file his petition. Worthan represented to the Court that there *was* a recantation and described Fadely's conviction for sexually abusing O.W. We cannot ignore Worthan's own admissions, affirmations, conduct, and pleadings. Further, by March 28, 2017, Worthan was on notice by this Court that his previous filings were

12

insufficient because he had not filed a PCR petition and counsel could not be appointed in the absence of a petition. *Worthan*, 2017 MT 74N, ¶¶ 6-7.

¶30     We conclude that Worthan's PCR petition is time barred. Our conclusion that Worthan's petition is time barred is dispositive of Worthan's alleged *Brady* violation, request for new trial, and request for discovery.[5]

**CONCLUSION**

¶31     Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

---

[5] A new trial motion must be filed within 30 days following a verdict or finding of guilt and be served upon the prosecution. Section 46-16-702(1)–(2), MCA. Worthan's deadline to file his motion passed on July 21, 2004. Worthan cannot simply rename his PCR petition a motion for new trial. Here, Worthan alleged the same newly discovered evidence in his motion for new trial as in his PCR petition. Worthan's conviction is 16 years old, he is presumed guilty, and he no longer has available to him the option of requesting a new trial—based on the statutory language itself. Worthan is limited to pursuing relief under the PCR statutes.